# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### SOUTH BEND DIVISION

| | | |
|---|---|---|
| TOMMY LAMPLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 3:08-CV- 282 PS |
| | ) | |
| DR. MICHAEL MITCHEFF, *et al*., | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

On October 24, 2005, while being housed at the Indiana State Prison ("ISP"), Tommy

Lampley sustained serious injuries when he was stabbed by another inmate. (DE 136-3, Medical

Records at 1-4.) Lampley claims that the doctors who treated him and other prison officials

failed to provide him with proper care for his injuries in violation of his Eighth Amendment right

to adequate medical care. Some of the defendants now seek summary judgment. First, the facts.[1]

Following the attack, Lampley received emergency treatment at St Anthony's Hospital

from Dr. Rade Pejic. (*Id*.) On October 26, 2005, Dr. Pejic discharged Lampley from the hospital

in good condition, with recommendations that his sutures be removed in two weeks and that he

receive occupational and physical therapy three times a week for ninety days. (*Id*. at 1-2.)

Following Lampley's release from the hospital, he returned to ISP. (*Id*. at 15.) Upon his return,

Lampley was assessed by medical staff, who noted that his sutures were intact and that there was

no drainage. He was placed in a holding cell across from the nurse's station, monitored every

few hours, and given Vicodin for pain. (*Id*. at 15-17.) Because ISP did not have an infirmary, Dr.

Michael Mitcheff, ISP's treating physician, requested that Lampley be transferred to Wabash

---

[1] The facts stated herein are undisputed unless otherwise stated.

Valley Correctional Facility ("WVCF"), which had an infirmary. (DE 64-3, Mitcheff Aff. ¶¶ 9, 10.)

On October 27, 2005, Lampley was transferred to WVCF. Dr. Noe Marandet and Dr. Anwar Jaffre provided Lampley's medical care while he was housed at WVCF. (DE 136-3, Medical Records at 17-19.) Upon his arrival, Dr. Marandet examined Lampley's wounds and prescribed Vicodin and Keflex. (*Id.* at 17-18.) The order for Vicodin was renewed on October 31, 2005, and a nurse cleaned and changed Lampley's bandages on that date. (*Id.* at 19.) On November 1, 2005, Dr. Marandet remarked that Lampley may have sustained nerve injury and recommended his transfer to a facility with a physical therapist. (*Id.* at 20.) On November 2, 2005, Dr. Marandet examined Lampley again, noting that his wounds were healing and that he could move all the fingers on his left hand. Dr. Marandet determined that Lampley's sutures were ready to be removed. (*Id.*) The next day, he removed Lampley's sutures and instructed him to refrain from bearing weight on his right leg. Lampley complained of pain in his leg at level "9" on a scale of "1 to 10." (*Id.*) That same day, Dr. Marandet requested a physical therapy consultation for Lampley. (DE 64-4, Medical Records at 13.)[2]

Dr. Marandet examined Lampley again on November 4, 2005, and noted that all of his wounds were healed. He prescribed Ibuprofen and Baclofen. (DE 136-3, Medical Records at 29.) On November 6, 2005, Lampley's left arm was placed in a splint. (*Id.*) On November 7, 2005, Lampley was approved for one physical therapy visit for purposes of evaluation with the

---

[2] In support of his motion for summary judgment, Lampley has submitted only a portion of his medical records. (*See* DE 136-3, Medical Records at 1-22; DE 136-6, Medical Records at 11-22.) Lampley's complete and authenticated IDOC medical file is already part of the record, having been submitted in connection with an earlier round of cross-motions for summary judgment. (*See* DE 64-4, Medical Records.)

notation, "If additional visits required please send notes." (DE 136-6, Medical Records at 11; DE 64-4, Medical Records at 13.) The request was approved by someone with what appears to be the initials "D.R." (DE 64-4, Medical Records at 13.) None of the defendants have those initials.

On November 14, 2005, Dr. Marandet again examined Lampley, and observed that his left hand was swollen and noted that he complained of "numbness," "tingling," and a "burning sensation." (DE 136-3, Medical Records at 30.) Dr. Marandet observed that Lampley was able to wiggle his fingers on his left hand. (*Id.*) On December 1, 2005, Lampley was seen at sick call complaining of pain and asking for physical therapy for his left hand and right leg. The nurse on duty referred Lampley to the doctor. (*Id.* at 31.) Dr. Jaffre examined Lampley on December 7, 2005, and noted that he could stand but could not walk. Dr. Jaffre ordered Tylenol and Elavil for 30 days and also ordered physical therapy. (DE 64-4, Medical Records at 20-21.) On January 7, 2006, Lampley again requested to see a doctor. When Dr. Jaffre saw Lampley on January 9, 2006, he renewed the Elavil for ninety days. (*Id.* at 22.)

On January 11, 2006, Lampley was transferred back to ISP.[3] (DE 136-3, Medical Records at 24.) Back at ISP, Lampley submitted a request for health care on January 15, 2006, stating that his left hand was "really cramped up" and sometimes "tingly" and "numb." (DE 136-

_____

[3] The record does not fully reveal the reasons for the multiple transfers that occurred during this period. Lampley has provided the paperwork relevant to some of the transfers, but they are written in IDOC short-hand and cannot be readily deciphered by non-prison personnel. (*See* DE 148-1.) It appears that the difference in facility security classifications precipitated at least one transfer. (*See* DE 148-1 at 4.) Another transfer occurred because Lampley had a civil case going to trial, presumably so he could be closer to the courthouse. (*See* DE 148-1 at 5.) The record reflects that transfers may occur for a variety of reasons, including the prisoner's age, safety classification, and behavior. (DE 151-2, Adult Offender Classification Policy at 1-2.) Transfer requests may be initiated by the inmate, facility staff, or classification staff at IDOC's central office. (*Id.* at 2-3.) The final decision to transfer is made by the IDOC central office. (DE 151-2, Pavese Decl. § 4.)

3, Medical Records at 27.) He requested that he be transferred to a "licensed physical therapy facility." (*Id*.) The following day, Dr. Mitcheff examined Lampley. He noted that Lampley had decreased range of motion in his left wrist, but that the laceration on his leg was well-healed, with intact muscle from the knee to the right hip. He noted that Lampley could bear weight on his right leg to get to the exam table. He noted that Lampley "will need PT/OT." He discussed with Lampley the need to do range of motion exercises for his hand and leg, and showed him how to perform these exercises. (DE 136-6, Medical Records at 20.) Dr. Mitcheff's notes indicate that he attempted to perform physical therapy on Lampley on that date but was unable to do so because Lampley was being "very belligerent" and refused to make a fist. (DE 64-4, Medical Records at 24-25.)

On February 11, 2006, Lampley was transferred back to WVCF. Dr. Jaffre examined him on February 28, 2006, and noted scars on his left forearm. He felt that Lampley was "malingering" because he would not cooperate in the examination or make a fist. Dr. Jaffre saw no signs of atrophy and opined that Lampley had good range of motion in his wrist. As a result, he concluded that Lampley did not need physical therapy or Vicodin. (DE 64-4, Medical Records at 42.) On April 3, 2006, Dr. Jaffre ordered Elavil for an additional 30 days. (*Id*. at 28.)

On April 6, 2006, Lampley was transferred to ISP. (DE 136-6, Medical Records at 20.) Upon his arrival, he complained of numbness in his right leg and left wrist. (DE 64-4, Medical Records at 29-31.) On April 14, 2006, Lampley was transferred back to WVCF. (*Id*. at 31.) When assessed by medical staff he complained of "headaches" and "bellyaches." (*Id.*) On April 19, 2006, Lampley was seen by medical staff and complained of leg cramps and a backache, but was found to have full range of motion in all his extremities. (DE 64-4, Medical Records at 32.)

On May 2, 2006, physical therapist Sue Chegon performed an evaluation on Lampley which she termed "unremarkable." (DE 136-6, Medical Records at 12-14.) She noted Lampley's complaints of numbness, tingling, and spasm, which were reportedly "not constant." Chegon observed a "well-healed flat and motile scar" along Lampley's forearm. She reported that his range of motion in his left wrist was within normal limits. She also concluded that he had full range of motion in his tendons, including the thumb. Chegon tested Lampley's strength, which was "4/5" on all wrist and hand motions, within the normal range. Chegon gave Lampley a home exercise program and reported that he exhibited the ability to perform these exercises. She determined that no additional physical therapy was indicated. (*Id.*) According to Chegon's notes, Lampley told her that he disagreed with her evaluation and accused her of "covering up" for the delay he experienced in receiving a physical therapy assessment. (*Id.*)

On December 7, 2006, Lampley submitted a health care request, complaining that his hand was "cramped up, tingly, and numb" and his leg was "painful." (DE 64-4, Medical Records at 37.) He requested stronger pain medication and physical therapy. (*Id.*) The nurse referred Lampley to sick call, but the medical records do not reflect whether Lampley saw a doctor in response to this request. On July 11, 2007, Lampley submitted another health care request, stating that he wanted physical therapy and a consultation with a "nerve specialist." (*Id.* at 38.) A nurse referred Lampley to the doctor twice, but he did not keep his scheduled appointments. (*Id.* at 40-41.) On the first occasion, he stated that he was declining to be seen because "the treatment was not to see a nerve specialist or physical therapist." (*Id.* at 40.) On the second occasion, he refused to come out for sick call and refused to sign the medical waiver form stating that he was declining treatment. (*Id.* at 41.)

On January 31, 2008, Lampley was transferred to Westville Correctional Facility ("Westville"), where he remains housed to date. (DE 12, Notice of Address Change.)

## PROCEDURAL HISTORY

On June 11, 2008, Lampley brought this action against numerous defendants alleging deliberate indifference to his medical needs. I permitted him to proceed with his claims against Dr. Mitcheff and Karla Foster from ISP and later to add claims against Drs. Jaffre and Marandet, who treated him at WVCF, as well as Alan Finnan and Dick Brown, the warden and assistant warden at WVCF. (DE 70, Pl.'s Am. Compl.; DE 77, Opinion & Order.) On December 28, 2009, I granted summary judgment to Dr. Mitcheff and Foster, concluding that Lampley's claims against them were barred by the statute of limitations and the doctrine of res judicata, and that Foster, as a non-medical staff member, could not be held liable for failing to provide adequate medical care when Lampley was under the care of prison doctors. (*See* DE 131, Opinion & Order.) That left Lampley's claims against Finnan, Brown, Dr. Jaffre, and Dr. Marandet.

Lampley now moves for summary judgment against the four remaining defendants. (DE 134, Pl.'s Mot. for Summ. J. ("Pl.'s Mot.").) Finnan and Brown have filed a cross-motion asking that judgment be entered in their favor. (DE 142, Finnan & Brown's Cross-Mot. for Summ. J.) Drs. Jaffre and Marandet, who are represented by private counsel, have filed an opposition to Lampley's motion.[4] (DE 139, Jaffre & Marandet's Resp. to Pl.'s Mot.) Lampley has filed numerous briefs and other documents in support of his request for summary judgment. (*See* DE

---

[4] Shortly before this opinion was issued, and more than three months after they filed their opposition to Lampley's motion, Drs. Jaffre and Marandet filed a cross-motion for summary judgment in their favor. (DE 169.) That motion has not yet been briefed, and I do not find it necessary or appropriate to delay ruling on the present motions, which have been fully briefed since late March 2010.

136, Pl.'s Aff. in Supp. of Mot. for Summ J.; DE 136-2, Pl.'s Designation of Evidence in Supp. of Mot. for Summ. J.; DE 146, Pl.'s Reply; DE 147, Pl.'s Resp.; DE 148, Pl.'s Decl. of Evidence in Supp. of Resp.; DE 151, Pl.'s Reply; DE 156, Pl.'s Reply; DE 157, Pl.'s Decl. of Evidence in Supp. of Resp.; DE 158, Pl.'s Reply; DE 159, Pl.'s Decl. of Evidence in Supp. of Reply.)

## LEGAL STANDARDS

To put it succinctly, summary judgment "is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008). Summary judgment is appropriate when "the discovery and disclosure materials on file, and any affidavits show there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*

To determine whether a genuine issue of material fact exists, I must construe all facts in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003). I cannot "choose between competing inferences," nor can I weigh the credibility of witnesses, since these are functions of the jury. *Abdullahi v. City of Madison*, 423 F.3d 763, 770 (7th Cir. 2005); *Keri v. Bd. of Trust. of Purdue Univ.*, 458 F.3d 620, 628 (7th Cir. 2006). When deciding a cross-motion for summary judgment, I must "constru[e] the evidence and all reasonable inferences in favor of the party

against whom the motion under consideration is made." *Durable Manuf. Co. v. U.S. Dep't of Labor*, 578 F.3d 497, 501 (7th Cir. 2009).

## DISCUSSION

Inmates are entitled to adequate medical care under the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To establish liability under the Eighth Amendment, a prisoner must show: (1) that his medical need was objectively serious; and (2) that the official acted with deliberate indifference to his health or safety. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). A medical need is "serious" if it is one that "has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). Deliberate indifference is a high standard, and is "something approaching a total unconcern for [a prisoner's] welfare in the face of serious risks," or a "conscious, culpable refusal" to prevent harm. *Duane v. Lane*, 959 F.2d 673, 677 (7th Cir. 1992); *Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005) (deliberate indifference involves intentional or criminally reckless behavior).

For a medical professional to be held liable for deliberate indifference to an inmate's medical needs, he or she must make a decision that represents "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008). Negligence, incompetence, or even medical malpractice do not amount to deliberate indifference. *Pierson v. Hartley*, 391 F.3d 898, 902 (7th Cir. 2004); *Walker v. Peters*, 233 F.3d 494, 499 (7th Cir. 2000). Where the defendants have provided care for a prisoner's medical condition, in order to establish deliberate indifference the prisoner must show

that "the defendants' responses to [his condition] were so plainly inappropriate as to permit the inference that the defendants intentionally or recklessly disregarded his needs." *Hayes v. Synder*, 546 F.3d 516, 524 (7th Cir. 2008). A prisoner is not entitled to demand specific care, nor is he entitled to the "best care possible." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997).

A.    **Non-Medical Defendants**

Finnan and Brown, the non-medical defendants, argue that they are entitled to summary judgment because they were not personally involved in Lampley's treatment and instead deferred to the doctors who were treating him at WVCF. (DE 143, Finnan & Brown's Mem. at 21-24.) Lampley responds that these defendants can be held liable for an Eighth Amendment violation because he sent them notice of a tort claim in which he alleged that he was not receiving proper medical care at WVCF. (DE 158, Pl.'s Reply at 4-16; DE 148-1 at 6.) Finnan and Brown say that they have no independent recollection of receiving any correspondence regarding Lampley's care, but further say that if they had, it would have been forwarded to medical staff at the facility. (DE 127-2, Brown Decl. ¶¶ 8-9; DE 127-3, Finnan Decl. ¶¶ 9-10.) For purposes of this motion, I will assume that the tort claim notice was in fact received by Finnan and Brown. Lampley believes that these defendants should have personally intervened in his care and taken action to ensure that he was transferred to another facility with a physical therapist on staff. (DE 158, Pl.'s Reply at 7-14.)

The problem with Lampley's theory is that it runs counter to Seventh Circuit case law governing Eighth Amendment liability for non-medical personnel. As the Court has explained:

> Public officials do not have a free-floating obligation to put things to rights . . . .
> Bureaucracies divide tasks; no prisoner is entitled to insist that one employee do
> another's job. The division of labor is important not only to bureaucratic
> organization but also to efficient performance of tasks; people who stay within

their roles can get more work done, more effectively, and cannot be hit with damages under § 1983 for not being ombudsmen. [The] view that everyone who knows about a prisoner's problem must pay damages implies that he could write letters to the Governor of Wisconsin and 999 other public officials, demand that every one of those 1,000 officials drop everything he or she is doing in order to investigate a single prisoner's claims, and then collect damages from all 1,000 recipients if the letter-writing campaign does not lead to better medical care. That can't be right. *The Governor, and for that matter the Superintendent of Prisons and the Warden of each prison, is entitled to relegate to the prison's medical staff the provision of good medical care.*

*Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009) (emphasis added). Therefore, simply

receiving prisoner correspondence – a tort claim notice, for example – about a medical problem

does not make a non-medical prison official liable for the failure to provide medical care under

the Eighth Amendment. *Id.* "A layperson's failure to tell the medical staff how to do its job

cannot be called deliberate indifference; it is just a form of failing to supply a gratuitous rescue

service." *Id.* at 596.

Here, the record shows that Finnan and Brown were prison officials responsible for

overseeing the day-to-day operations of the prison. (DE 127-2, Brown Decl.; DE 127-3, Finnan

Decl.) They had no medical training and were not involved in the provision of medical care to

inmates. (*Id.*) While Lampley was housed at WVCF, he was under the care of medical staff,

including Drs. Jaffre and Marandet. Lampley's medical records reflect that while he was housed

at WVCF, he was being seen by medical staff on a regular basis, was prescribed pain pills and

other medication, and received approval for a physical therapy evaluation. He ultimately

received a physical therapy evaluation, and the therapist determined that he did not need further

treatment other than to continue with exercises on his own. The fact that Finnan and Brown, who

have no medical expertise, did not directly intervene in Lampley's care and tell "medical staff

how to do its job" cannot be considered deliberate indifference. *Burks*, 555 F.3d at 596; *see also*

*Berry v. Peterman*, —F.3d—, 2010 WL 1780152, at *4 (7th Cir. 2010) ("[T]he law encourages non-medical security and administrative personnel at jails and prisons to defer to the professional medical judgments of the physicians and nurses treating the prisoners in their care without fear of liability for doing so."). For these reasons, Lampley has failed to show that Finnan and Brown were deliberately indifferent to his medical needs, and summary judgment must be entered in their favor.

### B.     Medical Defendants

Lampley next argues that Drs. Jaffre and Marandet were deliberately indifferent to his medical needs because they failed to provide him with the three months of physical therapy recommended by the emergency room doctor who treated him after he was stabbed. (DE 135, Pl.'s Mem.; DE 146, Pl.'s Reply.) However, at various points these doctors *did* request that Lampley receive physical therapy, in addition to monitoring his condition, treating his wounds, and providing him with pain medication. (DE 64-4, Medical Records at 13, 20-21; DE 136-6, Medical Records at 12; DE 136-3, Medical Records at 33.) Although Lampley did not actually see a physical therapist until some months later—perhaps due to the multiple transfers that occurred during this period—there is nothing to indicate that the delay was caused by Dr. Jaffre or Dr. Marandet. *See Jones v. v. Simek*, 193 F.3d 485, 491 (7th Cir. 1999) (prison doctor not liable for delay where initial treatment was ineffective and plaintiff missed an appointment for another type of treatment, since "this unfortunate turn of events was not because of anything Dr. Lopez did."); *see also O'Malley v. Litscher,* 465 F.3d 799, 806 (7th Cir. 2006) (prison doctor not deliberately indifferent where delay in treatment was caused by shift change of infirmary staff and not doctor's actions).

Lampley is also required to show that he was injured by the delay, and he has not done so. *Langston v. Peters*, 100 F.3d 1235, 1240 (7th Cir. 1996) ("[A]n inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed.") (internal citation and quote marks omitted). When Lampley was assessed by a physical therapist in May 2006, she determined that his functioning was within normal limits and that he did not need further treatment other than a home exercise program. (DE 136-6, Medical Records at 12-14.) Lampley does not agree with her assessment,[5] but mere disagreement with a medical professional about the proper course of treatment does not establish an Eighth Amendment violation.

*Berry*, —F.3d—, 2010 WL 1780152, at *4.

Moreover, even assuming the physical therapist did not perform a proper assessment, Drs. Jaffre and Marandet can only be held liable "for their own misdeeds but not for anyone else's." *Burks,* 555 F.3d at 596. Both doctors took action to have Lampley assessed by a therapist, in addition to providing other treatment for his injuries. Although early on both doctors believed Lampley was in need of physical therapy, some months later (notably, a few months

---

[5] Among other arguments, Lampley claims that Chegon could not have performed a proper assessment because he was wearing restraints during the examination. (DE 135, Pl.'s Mem. at 33-39.) The record reflects that Lampley was in disciplinary segregation at the time of the examination and pursuant to prison policy, he was required to wear restraints while out of his cell. (*See* DE 148-1 at 16, 20; DE 127-3, Finnan Decl. ¶¶ 14-16; DE 164-1, Manual of Policies & Procedures.) There is nothing in Chegon's notes to indicate that she had any difficulty assessing Lampley—due to the restraints or for any other reason. (*See* DE 136-6, Medical Records at 12-14.) However, even assuming Lampley is correct that Chegon did not perform a proper evaluation, there is nothing in the record to suggest that the defendants knew her assessment was inadequate.

after Lampley was shown by Dr. Mitcheff how to do range-of-motion exercises on his own), Dr. Jaffre saw no evidence of atrophy or other problems that would signal the need for physical therapy. His opinion, echoed by at least one other doctor, was that Lampley was malingering. (DE 64-4, Medical Records at 24-25, 42.) In short, Lampley has not shown that Drs. Jaffre and Marandet personally responded to his medical condition in a way that was "so plainly inappropriate as to permit the inference that the defendants intentionally or recklessly disregarded his needs." *Hayes*, 546 F.3d at 524. Accordingly, he is not entitled to summary judgment against them.

## CONCLUSION

For these reasons, the Court:

(1) **DENIES** Tommy Lampley's motion for summary judgment (DE 134); and

(2) **GRANTS** Alan Finnan and Richard Brown's cross-motion for summary judgment (DE 142).

**SO ORDERED**.

**ENTERED**: June 8, 2010

s/ Philip P. Simon
PHILIP P. SIMON, CHIEF JUDGE
UNITED STATES DISTRICT COURT
